FILED

JAN 31 2011

United States Bankruptcy Court
San Jose, California

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | ] Case No. 10-50394-ASW |
| VICTORIANO AND ANNALIZA DUARTE, | ] Chapter 13 |
| Debtors. | ] |

**MEMORANDUM DECISION RE MOTION TO DETERMINE VALUE
AND STATUS OF JUNIOR LIENHOLDER'S CLAIM**

Before the Court is the motion ("Motion") by debtors Victoriano and Annaliza Duarte ("Debtors") to determine the value and status of the second priority deed of trust held by creditors Duane E. Gifford and Marilyn L. Gifford ("Giffords") against the Debtors' primary residence located at 767 Lakehaven Dr. Sunnyvale, California 94089 (" Property"). Debtors seek a determination that the Giffords' second deed of trust is not secured in any amount and thus may be treated as unsecured in Debtors' chapter 13 plan. The Giffords oppose the Motion. Debtors are represented by Drew Henwood, Esq. of The Law Offices of Drew Henwood. The Giffords are represented by Benjamin R. Levinson, Esq. of the Law Office of Benjamin R. Levinson.

An evidentiary hearing on the Motion was held on September 2, 2010, and the matter has been submitted for decision. At the evidentiary hearing, Debtor called Daniel Ordaz ("Ordaz"), an appraiser, and Debtors as witnesses. The Giffords called Boris Chtchetinin, an appraiser, as a witness.

This Memorandum Decision constitutes the Court's findings of fact and conclusions of law, pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

I.

FACTS

Debtors commenced this case by filing a petition under Chapter 13 of the Bankruptcy Code on January 17, 2010. Debtors' main asset is the Property. Debtors purchased the Property in 1996 and have lived at the Property continuously since the time of purchase. Two deeds of trust have been recorded on the Property. The senior obligation and first deed of trust on the Property is held by US Bank National Association ("US Bank"). The Giffords are the beneficiaries of a pre-petition loan made to the Debtors. The Giffords' loan is secured by the second priority trust deed (the "Giffords' Lien") against the Property.

On the bankruptcy petition date, January 17, 2010, the amount owing to the first deed of trust holder US Bank was no more than $387,435.63 and that sum included advances by US Bank for payment of real property taxes.[1] On March 3, 2010, Debtors filed the

---

[1] US Bank's proof of claim in the amount of $387,435.63 was submitted to the Court at the time of hearing and entered into evidence. The Giffords do not contest that amount.

Motion. On March 12, 2010, the Giffords filed a Notice of Opposition and Request for Hearing. The hearing, initially held on June 7, 2010, was continued to September 2, 2010 for an evidentiary hearing.

At the September 2, 2010 hearing, each party offered an expert witness to opine as to the value of the Property at the time of Debtors' bankruptcy petition. Both experts prepared written reports and those reports were entered into evidence. Debtors' expert witness Daniel Ordaz is an independent contract appraiser of real property specializing in Santa Clara County. The Giffords' expert witness Boris Chtchetinin is an owner and principal appraiser for his own appraisal business, that operates throughout the entire Bay Area but specializes in Santa Clara County. Both appraisers were qualified to testify as experts concerning the value of the Property. Debtor Annaliza Duarte testified as to the condition of the Property on the petition date. Debtor Victoriano Duarte testified as to the value and surroundings of the Property on the petition date.

Ordaz holds a license from the State of California to conduct real property appraisals which Ordaz obtained in September of 2006. Ordaz estimated that Ordaz has done roughly 757 appraisals with 500 of those appraisals occurring in Santa Clara County. Debtors asked Ordaz to determine the market value of the Property as of the bankruptcy petition date, January 17, 2010.

Ordaz testified that Ordaz believed the fair market value of the Property was $370,000.00 as of January 17, 2010. Ordaz based that conclusion upon a sales comparison analysis of four comparable properties. Three of the properties were bank-owned properties,

i.e., the respective banks obtained these properties through foreclosure and now offer the properties for sale. One of the properties was a short sale. Ordaz determined that the value of the Property was $370,000 based on the sales comparison approach and $371,723 based on the cost approach.

Ordaz explained that a sales comparison approach to value is based upon an analysis of comparable properties within the same neighborhood in light of factors such as the real estate market of the particular neighborhood, the school systems, and the dwelling's characteristics including square footage, age, and condition. Ordaz testified that the Property was in average condition. Of particular note, Ordaz emphasized that all four of Ordaz's comparables had closed escrow **prior to** January 17, 2010, and thus the market would have been aware of those final sale prices at the time of petition. Ordaz criticized Chtchetinin's report as Chtchetinin's report consisted exclusively of sales that had closed **after** Debtors' bankruptcy petition date.

As noted above, the Ordaz report contained three sales of bank-owned properties and one short sale. The sales prices of the Ordaz comparables ranged from $366,860 to $395,000 and were sold between September 25, 2009 and January 13, 2010. The comparables were located from .14 miles to .80 miles away from the Property. Ordaz explained that Ordaz was unable to find any private sales (i.e., sales that were not bank owned) or short sales among the comparables in his research that were applicable and relevant. Ordaz further stated that bank-owned property sales and short sales were the predominant form of sale within the area of the subject property and thus are valid comparables when those sales are the

dominant sales mode within the neighborhood. Ordaz did not make adjustments in sale price based on whether the comparable consisted of a bank-owned property or short sale because Ordaz testified that it is not standard industry practice to make such adjustments due to the difficulty in objectively determining the value of the adjustment.

Debtor Annaliza Duarte testified that around the time of the bankruptcy petition, January 17, 2010, the Property suffered from mold problems, the bathroom sink leaked, and that sink leak had caused floor discoloration. Debtor Victoriano Duarte testified that around the time of the bankruptcy petition, the neighborhood was very busy as it is located close to a highway and there were many cars parked along the street. Victoriano Duarte also testified that a park and school are located behind the Property with no other houses obstructing access.

Chtchetinin testified that Chtchetinin believed the fair market value of the Property was $395,000 as of January 17, 2010. Chtchetinin based that conclusion upon a sales comparison analysis based on comparable properties -- all of which had sold prior to the court hearing but none of which had closed escrow at the time of Debtors' bankruptcy petition. Chtchetinin reviewed three comparable properties between .11 and .49 miles from the Property -- two of the comparable properties were bank owned properties sold after a foreclosure and one sold through a private sale. Chtchetinin determined that the value of the Property was $395,000 based on the sales comparison approach and was $381,200 based on the cost approach.

Chtchetinin is a licensed appraiser in the state of California and Chtchetinin has worked as a real estate appraiser for 6 years. Chtchetinin's work is exclusively residential and he has worked exclusively in Santa Clara County for the past three years. Chtchetinin estimated that Chtchetinin has made over 2,500 appraisals. Chtchetinin testified that, unlike Ordaz who is a trainee appraiser who works under the supervision of a licensed or certified appraiser, Chtchetinin is qualified as a licensed appraiser based on education and experience.

Chtchetinin explained that Chtchetinin had been engaged to make a retrospective appraisal for the Giffords. Chtchetinin testified that the residential tract where the Property was located was fairly typical for a 1950's tract with homes generally in the configuration of three bedrooms and two bathrooms. Chtchetinin recalled the price range for the area at the time in question to be between $360,000 and $460,000.

The adjusted sales price of the three comparable properties Chtchetinin used in his report ranged from $387,000 to $403,000. Chtchetinin testified that these three comparables in his report represented the mid-range of value where the Property fit based on condition; some other properties of superior quality were selling for $420,000 while some properties of lesser quality were selling for $360,000. Chtchetinin described the Property as average condition with some interior updates such as laminate flooring, limestone floors in some areas, wood cabinets, and granite counter tops. Chtchetinin criticized the Ordaz appraisal arguing that the Ordaz appraisal had used comparables of worse condition and on a

lower scale of value, particularly with respect to the inclusion of a comparable that was listed as a complete "fixer-upper".

Chtchetinin used sales which had not yet closed as of the petition date in Chtchetinin's retrospective appraisal explaining that while the sales did not close before the petition date, Chtchetinin verified that the contract prices of the comparable sales were also the final sales prices by cross checking the contract price with the post bankruptcy petition property closing price on the Multi Listing Service website. Chtchetinin stated that the Multi Listing Service search function did not have a feature to filter out properties that had not closed escrow prior to the bankruptcy petition date. Chtchetinin testified that if such filtering were necessary, it would need to be done manually by the appraiser. Chtchetinin acknowledged that it is possible for events to occur between the date of contract and the date of closing that could change the final closing price. However, Chtchetinin stated that those events did not occur here and that the contract prices were representative of the market prices at the time of Debtors' bankruptcy petition.

II.

ANALYSIS

Debtors' Motion requests this Court to determine the value and status of the Giffords' lien as wholly unsecured and void. Debtors contend that the fair market value of the Property on the bankruptcy petition date was less than the debt secured by US Bank's first priority trust deed, thus the Giffords' Lien was wholly unsecured at the time of bankruptcy. The Giffords oppose

the Motion arguing the fair market value of the Property exceeded US Bank's first priority lien, thus Giffords' second priority trust deed was at least partially secured and entitled to the "antimodification" provision of Bankruptcy Code section 1322(b)(2).

Debtors seek to value the Giffords' Lien on the Property based on Bankruptcy Code section 506(a)(1), which states:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim.

11 U.S.C. § 506 (a)(1). If the Court finds the Giffords' Lien to be wholly unsecured, as Debtors contend, then the Giffords are not the "holder[s] of a secured claim" whose rights are subject to the "antimodification" protection of Bankruptcy Code section 1322(b)(2). Zimmer v. PSB Lending Coporation (In re Zimmer), 313 F.3d 1220 (9th Cir. 2002). The consequence of such a finding is that Debtors could provide for the Giffords' claim through Debtors' chapter 13 plan as a general unsecured claim, rather than a secured claim. Zimmer, 313 F.3d at 1227. Conversely, if the Court finds the Giffords' Lien to be secured by even $1.00, the "antimodification" protection of Bankruptcy Code section 1322(b)(2) applies and the claim must be paid as a secured claim and cannot be modified by Debtors' chapter 13 plan.

Bankruptcy Code section 506(a)(1) instructs that when a court is requested to determine the value of collateral, "such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property..." 11 U.S.C. § 506(a)(1). When the debtors intend to stay in their house, the

proper valuation of the house under Bankruptcy Code section 506(a) is the fair market value. Taffi v. United States of America (In re Taffi), 96 F.3d, 1190, 1192 (9th Cir. 1996). The fair market value is not the "replacement" value because the house is not being replaced. Neither is it the "foreclosure" value because no foreclosure is intended in the chapter 13 plan. Taffi, 96 F.3d at 1192.

The fair market value is "the price which a willing seller under no compulsion to sell and a willing buyer under no compulsion to buy would agree upon after the property has been exposed to the market for a reasonable time." Taffi, 96 F.3d at 1192. Debtors intend to stay in the Property, cure the loan owed to US Bank, and treat the Giffords as general unsecured creditors.

For the purposes of granting or denying the Motion, this Court does not need to determine the exact value of the Property. In re Serda, 395 B.R. 450 (Bankr. E.D. Cal. 2008). The Court only needs to determine whether or not the value of the Property at the time of Debtors' bankruptcy petition was greater than, equal to, or less than the amount of the senior secured debt owed to US Bank. Serda, 395 B.R. at 453. Here, the amount owing to the first deed of trust holder was no more than $387,435.63 on the bankruptcy petition date and that sum included advances by that lender for payment of property taxes. US Bank's proof of claim in the amount of $387,435.63 was submitted to the Court at the time of hearing and entered into evidence without objection.

Debtors bear the initial burden of proof of overcoming any presumption established by the stated value in the secured creditor's proof of claim. Serda, 395 B.R. at 454. The secured creditor has

MEMORANDUM DECISION RE MOTION TO DETERMINE VALUE ETC.
9

Case: 10-50394   Doc# 49   Filed: 01/31/11   Entered: 02/08/11 13:52:54   Page 9 of 17

the ultimate burden of persuasion to demonstrate, by a preponderance of the evidence, the value of the collateral which secures its claim. In re Southmark Storage Associates Ltd. Partnership, 130 B.R. 9, 10 (Bankr. D. Conn. 1991).

Both parties' expert witnesses used the sales comparable method to estimate the fair market value of the Property at the time of Debtors' bankruptcy petition. The hearing on the matter lasted roughly four hours wherein both experts and Debtors testified. The Court considered all the evidence admitted at trial, including the testimony of both experts. In addition, the Court prepared its own statistical analysis based solely upon the appraisal reports submitted by the two experts. (Attached as Exhibits A-J).[2]

Debtors' expert, Ordaz, analyzed four comparable properties that were located between .14 and .80 miles from the Property. The properties Ordaz included in Ordaz's report were all sold between September 25, 2009, and January 13, 2010. Three of Ordaz's properties were bank-owned properties and one was sold through a short sale. Ordaz emphasized during his testimony that all of his comparables had closed escrow at the time of Debtors' bankruptcy petition. Based on these comparables, Ordaz concluded that the Property had a fair market value of $370,000 on the petition date. The Court calculated the average sales price of Ordaz's four comparable properties and found the average to be $375,091.00. (Exhibit C). Debtors' have presented evidence sufficient to overcome the presumption of value within the Giffords claim.

---

[2] The Court does not imply that the fair market value of any property is purely a statistical calculation, but it recognizes that such analysis can be instructive when confronted with conflicting and multifaceted data.

Giffords' expert, Chtchetinin, analyzed three comparable properties that were located .11 and .49 miles from the Property. The properties Chtchetinin included in Chtchetinin's report were all sold in December 2009. However, unlike Ordaz, none of Chtchetinin's properties closed before Debtors' bankruptcy petition date. Two of Chtchetinin's comparables were bank-owned properties and one was a private sale. The private sale sold for the highest price. Chtchetinin concluded that the fair market value of the Property was likely $395,000 on the petition date. The Court notes that the average of Chtchetinin's comparables was also $395,000. (Exhibit C).

The difference between the first lien holder's proof of claim and both appraisers' estimates of fair market value is very narrow. Debtors contend that the fair market value, based on the sales comparison approach, was $370,000; $17,435.68 **below** the amount owed to the first lien holder. The Giffords respond that the fair market value was actually $395,000; $7,564.34 **above** the amount of the first lien holder. The Court's statistical analysis of the combined data presented by the experts proved to be even closer with an average of all comparables of $383,623.43, an average excluding the highest and lowest comparables of $383,100.80, and a median of $387,000 leading differences of $3,812.20, $4,334.83, and $435.63, respectively. (Exhibits A, B and F). The average of all comparables, the average excluding the highest and lowest comparables, and the median are all **below** the first lien holder's proof of claim. Moreover, the Court found the average selling price of the three closest properties by distance to be $383,953.33 and the three properties with the sales date closest to the petition date to be $383,548.00 leading to differences of $3,482.30 and $3,977.63, respectively. (Exhibits D

MEMORANDUM DECISION RE MOTION TO DETERMINE VALUE ETC.
11

Case: 10-50394   Doc# 49   Filed: 01/31/11   Entered: 02/08/11 13:52:54   Page 11 of 17

and E). Again, both of these averages are **below** the first lien holder's proof of claim. Thus when the comparables are analyzed statistically as a whole, the comaparables generally indicate average and median values below that of the first lien holder's proof of claim. Based on the testimony at trial and this additional analysis, the Court finds that the Giffords' expert's testimony insufficient to persuade the Court that the preponderance of the evidence supports a value above that of the first deed of trust holder. Rather, it appears based on the fact four of the seven comparables are below the value of the first lien holder's proof of claim and the averages and medians of the data as a whole are below the first lien holder's proof of claim, the preponderance of the evidence demonstrates that the value of the Property was **below** the first lien holder's proof of claim.

  The Giffords rely on a decision of the Bankruptcy Court for the Eastern District of California which expressed concerns regarding the inclusion of bank-owned properties within appraisal reports for determining the fair market value of property. See Serda, 395 B.R. at 454. The Court in Serda noted the potential different motivations for sale between private party sales and bank-owned sales, stating that banks had the motivation to liquidate inventory quickly for low prices whereas private parties had the motivation to wait for higher prices. However, the Ninth Circuit in Taffi stated, "Valuation must be accomplished within the actual situation presented." Taffi, 96 F.3d at 1192. Debtor's expert, Ordaz, testified that bank-owned property sales and short sales were the predominant form of sale within the area of the Property. Giffords' expert, Chtchetinin, also

included two bank-owned properties -- out of the three comparables he used within his appraisal report.

Based on Ordaz's testimony that bank-owned property sales were the predominant form of sale within the area and the fact that two out of three of Chtchetinin's comparables were bank owned properties, the Court finds there is sufficient evidence to conclude that bank-owned property sales are relevant in determining the fair market value of the Property at the time of Debtors' bankruptcy petition. Allowing the sales prices of bank-owned properties to be considered as comparables does not require any subjective determination of the motivation of the parties. The advertised prices of bank-owned properties would have been available to potential buyers and would have shaped buyers' price expectations because bank-owned properties are also competing against owner occupied properties within the real estate market. The appraiser merely includes the bank-owned property sales along with any other relevant properties in the appraiser's value analysis. This is analogous to how bank-owned properties are equally available on the real estate market for buyers. Because bank-owned properties were the predominant form of transfer of real estate within the area of the Property, willing buyers would have considered these properties within buyers' purchase calculations. Therefore, it is appropriate to include bank-owned properties in determining the fair market value of the Property because these types of properties were available on the market and were actively competing against private sales in the real estate market.

Even though there is the potential argument that bank owners of foreclosed property are under different motivations than private party owners of owner occupied homes, there is no objective method to

determine the value of the potential difference of motivation. Ordaz testified that it is not common appraisal practice to make adjustments based on whether a home is owner-occupied or bank-owned because of the impossibility of making an objective valuation of the different motivations of the parties. A valuation of an adjustment for the different motivations of the parties would require the appraiser to devine the subjective intentions of the parties. Such an adjustment is unworkable in appraisal practice and cannot be used adjust value here. Moreover, two out of three of Chtchetinin's comparables were also bank-owned properties indicating that Chtchetinin believed bank-owned properties were highly relevant to the valuation of the Property. Therefore, based on testimony that bank-owned properties predominated in the subject real estate market and that both appraisers included bank-owned properties in their respective appraisal reports, the Court finds sufficient evidence to conclude that willing buyers would have certainly considered bank-owned properties in their purchase calculations and making objective adjustments for differences in sellers' motivations is not practical or even possible.

Debtors raised additional issues claiming that these issues could have influenced the fair market value of the Property. The expert appraisers differed on the appropriateness of using comparable sales that did not close prior to the bankruptcy petition. As the two experts disagreed, the Court frankly does not know whether it is appropriate in the appraiser profession for Chtchetinin to rely on these properties as comparables. However, for the purpose of this decision only, with no precedential value intended, the Court will

assume that the use of these properties as comparables is allowed in the profession.

Neither party cited, and the Court did not find any law expressly permitting or prohibiting such use and it appears that the Serda decision may have used such sales. The Giffords' expert testified that all of the sales used in his report did eventually close for the prices stated in the appraisal report. Debtors argued that Debtors would not have known that these homes were sold for these prices at the time of the bankruptcy petition and thus would not have known -- in deciding how to price Debtors' home for sale -- to consider those homes.

The Court's only objective is to determine the fair market value of the Property at the time of the bankruptcy petition. The Court agrees with Debtors that unclosed sales -- which Debtors and other parties in the market for homes at the time would not have known -- are sales which could not have been used by Debtors to determine the market price at the time of the bankruptcy petition. However, these comparables are the only comparables used by the Giffords expert. Because, even considering these comparables, this Court finds that the fair market value of the Property at the time of Debtors' bankruptcy petition was less than the amount of the senior secured debt owed to US Bank, the Court will consider the unclosed comparables, notwithstanding this Court's reservations.

Debtors testified regarding the condition and surroundings of the subject property. Debtors testified to the appearance of mold, a leaking sink in one of the home's bathrooms and that the water had caused discoloration on the floor of the bathroom. Debtors also testified the Property is located near a park and a school where the

for these factors. While the appearance of mold, leaks and water discoloration are likely to have had a negative impact on the potential selling price of the Property, the park and school may have had positive impacts. Without additional evidence, any adjustment based on these factors is speculative. The Court chooses to focus on the comparables and the central tendency of the values found in the appraisal reports.

Based on the evidence admitted at the hearing and the arguments of counsel, the Court finds that the fair market value of the Property at the time of Debtors' bankruptcy petition was less than $387,435.63, the amount of the senior secured debt owed to US Bank.

### III.

### CONCLUSION

For the foregoing reasons, Debtors' Motion to determine the value and status of the Giffords Lien as wholly unsecured and void is granted. The Court finds that the value of the Property was less than the amount secured by the first deed of trust. Accordingly, the Giffords' secured claim is wholly unsecured and is not entitled to the protection of Bankruptcy Code section 1322(b)(2). Counsel for Debtors shall prepare a proposed form of order, serve it on counsel for the Giffords, and submit it to the Court.

Dated: 1/31/11

ARTHUR S. WEISSBRODT
UNITED STATES BANKRUPTCY JUDGE

Court Service List

Victoriano David Duarte
767 Lakehaven Dr
Sunnyvale, CA 94089

Annaliza Pugeda Duarte
767 Lakehaven Dr
Sunnyvale, CA 94089

Drew Henwood
Law Offices of Drew Henwood
41 Sutter St. #621
San Francisco, CA 94104

Benjamin R. Levinson
Law Office of Benjamin R. Levinson
46 N. Second Street, Suite A
Campbell, CA 95008

Devin Derham-Burk
P.O. Box 50013
San Jose, CA 95150-0013

Office of the U.S. Trustee / SJ
U.S. Federal Bldg.
280 S 1st St. #268
San Jose, CA 95113-3004